

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00720-CV

**TEXAS DEPARTMENT OF PUBLIC SAFETY**,
Appellant

v.

Jessica **ABREGO**,
Appellee

From the 83rd Judicial District Court, Val Verde County, Texas
Trial Court No. 2024-0181-CIV
Honorable Robert E. Cadena, Judge Presiding

Opinion by:　Lori I. Valenzuela, Justice

Sitting:　　　Lori I. Valenzuela, Justice
　　　　　　　Lori Massey Brissette, Justice
　　　　　　　H. Todd McCray, Justice

Delivered and Filed: August 5, 2026

REVERSED AND RENDERED

The underlying lawsuit arises from a traffic accident in which a vehicle driven by Texas Department of Public Safety ("DPS") Sergeant Ryan Glenn side-swiped a vehicle driven by Jessica Abrego. Abrego sued DPS under the Texas Tort Claims Act ("TTCA"), alleging Glenn was negligent in operating a DPS motor-driven vehicle and that his negligence was a proximate cause of her injuries. DPS answered and filed a plea to the jurisdiction and, alternatively, a motion for summary judgment. After conducting a hearing on the plea and motion, the trial court signed an

order denying both. In this interlocutory appeal, DPS asserts the trial court erred in denying its plea based on sovereign immunity and by concluding a fact issue exists to defeat DPS's claim of official immunity. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8). We reverse the trial court's order and render judgment granting the plea and dismissing all claims for lack of subject matter jurisdiction.

## I. BACKGROUND

The relevant events leading to the collision appear to be undisputed. In the early morning hours of October 20, 2022, Probationary Trooper Wenyi Torres was driving southbound on US-277 in a marked DPS vehicle. Two other passengers were in the vehicle: Glenn and then-Trooper (now Special Agent) Brian Staffen. On this morning, the sky was dark, the road was dry, there were no streetlights, and the only illumination was provided by other cars travelling on US-277. Shortly before 7:00 a.m., Glenn took over driving. When he did so, he adjusted the driver's seat, but did not adjust the side-view mirrors. In his affidavit filed in support of DPS's plea and motion, Glenn stated:

> I did not intentionally fail to properly adjust the side mirrors. Due to the early morning darkness and the lack of streetlights on the road, when I looked into the side view mirrors I believed that they were properly adjusted. The drivers side mirror on the DPS vehicle I was driving on October 20, 2022, has an integrated convex blind-spot mirror in the upper left side of the mirror which increase[s] a driver's field of view and enable[s] drivers [to] see areas around their cars that are normally not visible in the side view mirror and eliminate the driver's blind-spot when properly adjusted. I did not realize that the mirrors were improperly adjusted because the road behind me was dark. When I looked in the side view mirror, I believed I was seeing the dark road behind me.

A few minutes after taking over the driving, Glenn saw a vehicle in the northbound lane of US-277 travelling three to five miles over the speed limit. Deciding to pursue the speeding car, Glenn activated his vehicle's overhead lights and moved to the shoulder of the road to make a U-

turn.[1] He did not activate his vehicle's siren. When Glenn checked his driver's side-view mirror, he did not see any vehicles behind him. As Glenn began to make the U-turn, Abrego attempted to pass him on his left side in her car. Glenn sideswiped Abrego's car.

After Abrego filed suit, DPS filed a plea to the jurisdiction and, alternatively, a motion for traditional and no-evidence summary judgment. In its plea, DPS asserted Abrego failed to allege and/or prove a waiver of sovereign immunity under the TTCA because of Glenn's official immunity. Therefore, the trial court lacked subject matter jurisdiction and should dismiss Abrego's suit as a matter of law. Alternatively, DPS alleged Abrego had no evidence to controvert the undisputed fact that Glenn's actions at the time of the incident entitled him to official immunity and, as such, she could not prove the prima facie elements of her TTCA claim. DPS also alleged it conclusively established each element of the affirmative defense of official immunity; therefore, Glenn would not be personally liable to Abrego under the TTCA. Without stating its grounds, the trial court denied the plea and motion. This appeal ensued.

## II. Applicable Law

An assertion of governmental immunity implicates the trial court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction, motion for summary judgment, or other procedural vehicle. *Tarrant Reg'l Water Dist. v. Johnson*, 572 S.W.3d 658, 664 (Tex. 2019); *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). Whether a trial court has subject matter jurisdiction is a legal question that we review *de novo*. *City of San Antonio v. Maspero*, 640 S.W.3d 523, 528 (Tex. 2022). This review mirrors that of a traditional summary judgment motion. *Id.* "If the evidence creates a fact question regarding the jurisdictional issue,

---

[1] The parties agreed this was not an emergency; therefore, the emergency exception to waiver of government immunity did not apply.

then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227–28 (Tex. 2004). "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law." *Id.* at 228.

As a governmental unit, DPS is immune from suit and liability unless the State has waived immunity. *See* TEX. GOV'T CODE § 411.002(a) (establishing DPS as agency of State); TEX. CIV. PRAC. & REM. CODE § 101.001(3)(A) (defining "governmental unit" to include State agencies); *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 926 (Tex. 2015) (per curiam) (stating governmental unit is immune unless State consents). The TTCA provides a limited waiver of sovereign immunity. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1). As applicable here, under the TTCA, a governmental unit's sovereign immunity is waived for "property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if . . . the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment [and] the employee would be personally liable to the claimant according to Texas law[.]" *Id.*

"One type of 'individual immunity' that shields government employees from personal liability is the common-law affirmative defense of official immunity." *City of Houston v. Rodriguez*, 704 S.W.3d 462, 468 (Tex. 2024). "Although official immunity is the employee's affirmative defense, not the governmental employer's, the Legislature expressly chose language making the [TTCA's] waiver of the employer's immunity from suit contingent on the fact that 'the employee would be personally liable.'" *Id.* "[T]his means that the governmental employer's immunity is not waived if its employee is protected by official immunity." *Id.*; *see also DeWitt v.*

*Harris County*, 904 S.W.2d 650, 653 (Tex. 1995). "Thus, in a suit against the governmental employer, governmental immunity and official immunity may be essentially entwined." *Rodriguez*, 704 S.W.3d at 468–69. "But unlike governmental immunity, official immunity is an affirmative defense that must be pleaded and proved to shield an employee from personal liability; otherwise, the defense is lost." *Id.* at 469. As a result, a plaintiff could carry her burden of affirmatively showing waiver of governmental immunity under the TTCA—including establishing that the employee would be personally liable—without affirmatively negating the employee's official immunity. *Id.* For that reason, "a governmental employer bears the burden to assert and prove its employee's official immunity, in a manner analogous to an affirmative defense, to preclude enforcement of the [TTCA's] waiver of governmental immunity on that ground." *Id.*

DPS asserted its governmental immunity based on Glenn's official immunity. Because official immunity is an affirmative defense, DPS, as the defendant, had the burden to establish all elements of the defense.[2] *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). We subject pleas to the jurisdiction by governmental entities asserting official immunity to the same evidentiary burden as a movant moving for summary judgment on an affirmative defense. *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 643 (Tex. 2015) (per curiam) ("The issue in this case is whether DPS's summary-judgment evidence conclusively established the 'good faith' element of the defense."). If DPS satisfied its burden, then the burden shifted to Abrego to present evidence sufficient to raise a genuine issue of material fact regarding the jurisdictional issue. *Romero v. Harris County*, No. 14-19-00904-CV, 2021 WL 5183586, at *4 (Tex. App.—Houston [14th Dist.] Nov. 9, 2021, no pet.) (mem. op.).

---

[2] DPS's motion for summary judgment was based on traditional and no-evidence grounds. Because common-law official immunity is an affirmative defense, and DPS had the burden to prove each of its elements, "a no evidence motion was inapt[.]" *Dorrough v. Faircloth*, 443 S.W.3d 278, 285 (Tex. App.—San Antonio 2014, no pet.).

To prove the official immunity defense and negate an essential jurisdictional fact under TTCA section 101.021(1)(b), DPS had the burden of conclusively establishing the following essential elements of Glenn's official immunity defense: (1) Glenn was acting within the scope of his employment, (2) he was performing a discretionary duty, and (3) he was acting in good faith. *See Bonilla*, 481 S.W.3d at 642–43; *Chambers*, 883 S.W.2d at 653. Abrego does not dispute that Glenn was acting with discretion and within the scope of his authority. The issue is thus narrowed to whether DPS established the "good faith" element of the defense.

A test of good faith is a test of objective reasonableness without regard to the governmental employee's subjective state of mind. *City of San Antonio v. Riojas*, 640 S.W.3d 534, 538 (Tex. 2022). Here, DPS had the initial burden to show that a reasonably prudent officer, under the same or similar circumstances, could have believed that his conduct was justified based on the information he possessed when the conduct occurred. *Id.* at 541; *Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002). DPS did not have to prove that it would have been unreasonable not to take these actions, or that all reasonably prudent officers would have taken the same actions. *See Riojas*, 640 S.W.3d at 541; *Telthorster*, 92 S.W.3d at 465. Rather, DPS "must prove only that a reasonably prudent officer, under similar circumstances, *might* have reached the same decision." *See Telthorster*, 92 S.W.3d at 465.

That a police officer "was negligent will not defeat good faith; this test of good faith does not inquire into what a reasonable person *would have done*, but into what a reasonable officer *could have believed*." *Id.* (internal quotation marks and citations omitted.) The "objective good faith test 'does not place an onerous burden on law enforcement.'" *City of Houston v. Sauls*, 690 S.W.3d 60, 75 (Tex. 2024) (quoting *Riojas*, 640 S.W.3d at 540); *Telthorster*, 92 S.W.3d at 463

("[O]fficial immunity is designed to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light.").

If DPS met its burden, to controvert, Abrego had to do more than show that a reasonably prudent officer could have reached a different decision. *See Telthorster*, 92 S.W.3d at 465. Instead, Abrego had to offer evidence that no reasonable officer in Glenn's position could have believed that the facts were such that they justified his conduct. *See id.* "[I]f officers of reasonable competence could disagree on this issue," then the officer acted in good faith as a matter of law. *Id.* (citation omitted).

## III. THE EVIDENCE

On appeal, DPS asserts it conclusively established that Glenn acted in good faith based on the testimony of Glenn and its experts Staffen and Lt. Noe Fernandez. Abrego counters that she presented evidence through Glenn's own testimony and the testimony of her expert, Officer Daniel Losey, that raised a fact issue on the good-faith element of the official immunity defense.

### A. DPS's Evidence

#### 1. Glenn's Testimony

Glenn testified to his years of law enforcement service, his training in field reconstruction and motor vehicle investigations, his continuing training in traffic stops and pursuits, and that he has conducted over 10,000 traffic stops. His duties include "conducting a traffic stop of a speeding vehicle." He explained that while on patrol the morning of October 20, he observed a speeding vehicle in the opposite lane, and his training and experience informed him that "it is necessary or prudent to stop speeding vehicles" because "if basic traffic enforcement wasn't done, then traffic collisions would be much higher." He said that, in "thousands of U-turns," he had "never once had an issue before." If he "thought it wasn't safe" to turn, he would have "called another officer to

pull over the speeding vehicle." He stated that "making sure it's clear" "before [he] make[s] a U-turn" is "always ke[pt] at the highest forefront" of his mind.

To pursue the speeding vehicle, Glenn slowed down, turned on his overhead emergency lights, moved onto the shoulder, checked his driver's side-view mirror, and began making the U-turn. He explained that the driver's side mirror has "an integrated convex blind-spot mirror in the upper left side of the mirror which increase[s] a driver's field of view and enable[s] drivers [to] see areas around their cars that are normally not visible" and thus "eliminate[s] the driver's blind-spot when properly adjusted." Therefore, when he checked the side mirror, he believed it was "properly adjusted" such that "he could see what was coming behind [him] had there been a car behind [him]." Because he did not see a car when he looked, he did not believe there "were any vehicles behind [him]."

On appeal, DPS argues that Glenn's testimony demonstrates "his conduct was justified based on the information he possessed when the conduct occurred." *See Telthorster*, 92 S.W.3d at 465. DPS contends that if Glenn's belief that there were no cars behind him when he checked the side-view mirror had been correct, then his U-turn would have been safe because there is no dispute that a reasonably prudent officer would have decided to make a U-turn on an empty stretch of road. DPS argues that Glenn's mistaken belief about whether Abrego's vehicle was behind him does not establish liability because a reasonably prudent officer could have acted in good faith on the same mistaken sensory perceptions and believed the roadway was clear of other vehicles. Thus, DPS concludes, Glenn acted reasonably under the facts as he perceived them based on the information available to him and is entitled to official immunity.

### 2. Staffen's Testimony

DPS relied on the expert testimony of Staffen, a law enforcement officer with over ten years' experience who was in the DPS vehicle when the accident occurred. In his affidavit, Staffen stated he believed "a reasonable and prudent peace officer under same or similar circumstances as [Glenn] was and knowing what he knew at that time (to wit, that he could see the traffic coming up behind our vehicle), could have believed that [Glenn's] conduct in attempting the U-turn was justified" at the time of the accident. He also stated that, based on his training and experience as a DPS Trooper and Special Agent, "lowering the driver's window 'to hear any oncoming vehicles on the desolate highway' while attempting to make a U-turn is not taught, recommended or required in any DPS, Texas Department of Transportation or [Texas Commission on Law Enforcement] publications, nor any Texas statute or administrative rule."

### 3. Fernandez's Testimony

DPS also relied on the expert testimony of Fernandez, a law enforcement officer with over twenty-two years' experience. In his affidavit, Fernandez stated that, based on his experience, Glenn "was acting as a reasonably prudent officer when he decided to initiate the traffic stop," and the actions he took, including "check[ing] his side mirror for traffic and seeing no vehicles in the left lane before making a U-turn, were made in good faith." Fernandez believed "a reasonable and prudent peace officer under the same or similar circumstances as [Glenn], could have believed that his conduct was justified based on the information he possessed" when the accident occurred.

### 4. Conclusion

The above evidence satisfied DPS's initial burden to prove that a reasonably prudent officer, under similar circumstances, could have believed Glenn's conduct was justified. *See Telthorster*, 92 S.W.3d at 465 ("[H]e must prove only that a reasonably prudent officer, under

similar circumstances, *might* have reached the same decision."). Therefore, we next determine whether Abrego offered evidence to create genuine issues of material fact sufficient to defeat DPS's entitlement to immunity. *Id.* To satisfy this burden, Abrego was required to offer evidence that no reasonable officer in same position could have believed that the facts were such that they justified Glenn's conduct. *Id.*

**B. Abrego's Evidence**

Abrego contends the evidence she submitted demonstrates Glenn's "plain incompetence and violation of the law." She argues that because official immunity does not protect the plainly incompetent or those who violate the law, the trial court properly denied DPS's motion for summary judgment.

**1. Losey's Testimony**

Abrego relied on the expert testimony of Daniel Losey, who has decades of experience in law enforcement and the legal field. Losey stated that the record contained no evidence of improper driving on Abrego's part, but "the evidence expose[d] several perilous driving behaviors by [Glenn] leading to his crashing into [Abrego's] vehicle." Losey relied on the on-scene crash investigation in which the trooper conducting the investigation determined that the only contributing factor in the cause of the crash was Glenn having "Turned when Unsafe." Losey also relied on a crash review report that concluded the only causative contributing factor in the crash was when Glenn "Turned when Unsafe." Relying on the "Texas Department of Transportation Instructions to Police for Reporting Crashes," Losey contended the following other factors were ignored by DPS personnel involved in investigating this crash: "Changed Lane when Unsafe," "Driver Inattention," and "Failed to Drive in a Single Lane." After opining on the many things he believed Glenn did or should not have done, Losey stated his opinion on the good cause element.

Losey took issue with Glenn's characterization as the traffic that night being "light." Relying on Wenyi Torres' dashcam footage, Losey said that, in "the span of just two minutes prior to the crash twelve different vehicles drove past [Glenn's] vehicle on the 75-mph highway." According to Losey, "it is axiomatic that the act of conducting the traffic stop cannot be assumed to be in good faith without considering the totality of the circumstances faced by the officer at the time and considering the safety of others." In Losey's opinion, "[a]ny reasonable and prudent officer would know that making a U-turn on a narrow highway with vehicles passing by at near or perhaps above the 75-mph speed limit, at night, with an average of one vehicle passing by every ten seconds is an extremely dangerous undertaking."

Losey stated that because "the extreme risk of harm is so high when entering a high-speed highway, from a near stop, such a maneuver [Glenn's U-turn] must only be done with the utmost caution[, and] [a]nything less is nothing short of a reckless disregard for the safety of others on the highway." Noting that the only thing Glenn claimed to have done to ensure it was safe to make a U-turn was to look in the side mirror that he had failed to adjust properly, Losey opined that a reasonable officer would have a good faith belief that his conduct was justified in making the U-turn "by simply looking to his left behind him to see if there were any headlights coming southbound," and by "lower[ing] his window allowing him to not only see but to hear any oncoming vehicles on the desolate highway." Losey concluded that "[o]nly after taking these additional and simple precautions would a reasonable officer believe his conduct was justified in making such a U-turn," and Glenn "disregarded the safety of others by choosing not to take simple precautions before engaging in a known dangerous maneuver." According to Losey, "[n]o reasonable officer could have a good faith belief that such conduct was justified."

### 2. Glenn's Testimony

Abrego also relied on Glenn's testimony. She points to his admissions that he adjusted the seat, but he did not adjust his side-view mirrors and he does not use the rearview mirror because "because [of] the way our vehicles are, you can't see out of the back with them." Glenn explained that the rearview mirrors are difficult to see through because there is "so much equipment in the back," and he usually used the side mirrors. He said that "with all the weight in the Tahoes, the rearview mirror a lot of times just looks at the roof of the vehicle in the back because it's kind of weighted down." Abrego argues that Glenn's deposition testimony—where he referenced checking a singular "mirror"—indicates that before he began his U-turn, he knew he had failed to adjust his side-view "mirrors" (plural).

### 3. Other Evidence

On appeal, Abrego relies on dashcam footage that she contends shows Glenn made the U-turn less than two seconds after activating his lights, he did not pause between pulling onto the shoulder of the highway and turning back into traffic, and he struck Abrego's car within two seconds of making the U-turn. Abrego asserts that the "utmost caution" that the circumstances required of any reasonably prudent officer was, at minimum, to afford trailing motorists sufficient warning time to process that emergency lights have been activated and to respond accordingly. Abrego argues "[t]here can be no good-faith dispute that a four-second window is grossly inadequate under the circumstances that [she] faced at the time of the wreck," and no reasonable officer could have believed in good faith that Glenn's actions were justified. Abrego contends the conduct at issue in this case reflects a degree of conscious disregard for public safety that does not justify the protections of official immunity.

# IV. ANALYSIS

"The appropriate focus [of the good-faith standard] is what a reasonable officer *could have believed,* and the determinative inquiry is whether any reasonably prudent officer possessed of the same information could have determined the trooper's actions were justified." *Bonilla*, 481 S.W.3d at 644. Losey's opinion was based, in part, on what he believed Glenn *should* have done—look to his left behind him and lower his window to see and hear any oncoming vehicles. But "evidence of good faith is not controverted merely because a reasonably prudent officer could have made a different decision." *Id.* at 643.

Abrego's contention that Glenn acted with reckless disregard appears to advance the argument that the affirmative defense of official immunity cannot apply to shield actions of governmental employees who act recklessly. Her argument is misplaced. "Recklessness is negligence, and negligence is immaterial when determining if an officer acted in good faith." *Johnson v. Campbell*, 142 S.W.3d 592, 596 (Tex. App.—Texarkana 2004, pet. denied); *see also Martinez v. Harris County*, 526 S.W.3d 557, 563 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (good-faith inquiry does not concern carelessness or negligence).

Furthermore, even if we assume that Glenn was negligent in failing to adjust the side-view mirror, look in the rearview mirror, or lower his window, this does not defeat his good faith. The good faith standard "is not equivalent to a general negligence test, which addresses what a reasonable person *would have done*[.]" *Bonilla*, 481 S.W.3d at 643–44 (internal quotation marks and citation omitted). Thus, "[e]vidence of negligence alone will not controvert competent evidence of good faith." *Id.* at 644 (internal quotation marks and citation omitted); *see also Telthorster*, 92 S.W.3d at 467 ("At most, Tennell raised a fact issue regarding Telthorster's negligence which, as we have said, is not enough to controvert Telthorster's good faith.").

Abrego's expert, Losey, opined on what he believed Glenn should have done—*i.e.*, "look[] to his left behind him to see if there were any headlights coming southbound" and "lower[] his window allowing him to not only see but to hear any oncoming vehicles on the desolate highway." But Losey's affidavit does not support a conclusion that *no* reasonable officer in the same or similar circumstances would have relied on what Glenn thought he saw in his rearview mirror. *See Sauls*, 690 S.W.3d at 80. Specifically, the affidavit does not establish that Glenn "was plainly incompetent or that he knowingly violated the law[.]" *Harris County v. Mireles*, 672 S.W.3d 663, 680–81 (Tex. App.—Houston [14th Dist.] 2023, pet. denied). Losey's affidavit therefore "failed to controvert [DPS's] proof of good faith." *See Sauls*, 690 S.W.3d at 80; *Mireles*, 672 S.W.3d at 680–81.

Finally, evidence that a law enforcement officer violated a law enforcement department policy does not raise a fact issue to rebut a law enforcement officer's good faith nor does recklessness in the performance of the officer's duty belie his good faith. *See Johnson*, 142 S.W.3d at 596; *Vasquez v. City of San Antonio*, No. 04-05-00707-CV, 2006 WL 1539636, at *4 (Tex. App.—San Antonio June 7, 2006, no pet.) (mem. op.). Thus, even assuming Glenn violated department policies or procedures, his alleged violation does not mean he did not act in good faith.[3] *Id.*

We conclude DPS conclusively established its entitlement to government immunity based on Glenn's affirmative defense of official immunity and Abrego did not raise a fact issue sufficient to defeat its entitlement. Because official immunity shields Glenn from liability, sovereign immunity shields DPS from vicarious liability. *See DeWitt*, 904 S.W.2d at 653.

---

[3] There is no allegation that Glenn violated a State law.

## V. CONCLUSION

We sustain DPS's issue on appeal. Therefore, we reverse the trial court's order denying DPS's plea to the jurisdiction and render judgment granting the plea and dismissing Abrego's claims for lack of subject matter jurisdiction.

Lori I. Valenzuela, Justice